# 24-2192-cv

## United States Court of Appeals
### *for the*
## Second Circuit

---

ANTHONY ANDRE PAUL, as Co-Administrator of the Estate of ANTHONY ANDRE PAUL II, deceased, ALBERTY PAUL, as Co-Administrator of the Estate of ANTHONY ANDRE PAUL II, deceased,

*Plaintiffs-Appellants,*

— v. —

CITY OF NEW YORK, NORTH CENTRAL BRONX HOSPITAL, individually, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, DEPUTY CHIEF VINCENT GIORDANO, individually and in his capacity as a member of the New York City Police Department, CAPTAIN EUGENE McCARTHY, individually and in his capacity as a member of the New York City Police Department, DETECTIVE ANTHONY DiFRANCHESCA,

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

DEREK S. SELLS
THE COCHRAN FIRM
*Attorneys for Plaintiffs-Appellants*
55 Broadway, 23rd Floor
New York, New York 10006
(212) 553-9215

CP COUNSEL PRESS   (800) 4-APPEAL • (332463)

individually and in his capacity as a member of the New York City Police Department, DETECTIVE RICHARD HEFNER, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER ARAMIS RAMOS, individually and in his capacity as a member of the New York City Police Department, DETECTIVE DARREN McNAMARA, individually and in his capacity as a member of the New York City Police Department, SERGEANT O'DOHERTY, individually and in his capacity as a member of the New York City Police Department, LIEUTENANT MICHAEL LICITRA, individually and in his capacity as a member of the New York City Police Department,

*Defendants-Appellees.*

NEW YORK CITY EMERGENCY MEDICAL SERVICES OF THE NEW YORK FIRE DEPARTMENT, CAPTAIN CHRISTOPHER LINDQUIST, individually and in his capacity as a member of the New York City Police Department, CAPTAIN WILLIAMS, individually and in his capacity as a member of the New York City Police Department, LIEUTENANT MALONEY, individually and in his capacity as a member of the New York City Police Department, SERGEANT DAMERON, individually and in his capacity as a member of the New York City Police Department, SERGEANT HICKS, individually and in his capacity as a member of the New York City Police Department, DETECTIVE JACK, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER NEWMAN, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER SWEETING, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER HEREDIA, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER McMORROW, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER BAEZ-VERAS, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER MUNOZ, individually and in his capacity as a member of the New York City Police Department, DETECTIVE ANDREW McCORMACK, individually and in his capacity as a member of the New York City Police Department, POLICE OFFICER BUNDY, individually and in his capacity as a member of the New York City Police Department, DETECTIVE GEZURIAN, individually and in his capacity as a member of the New York City Police Department, DETECTIVE WARGO, individually and in his capacity as a member of the New York City Police Department, JOHN/JANE DOES, individually and in his capacity as a member of the New York City Police Department, DETECTIVE FINBAR McCARTHY, individually and in his capacity as a member of the New York City Police Department,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................v

JURISDICTIONAL STATEMENT ...................................................1

ISSUES FOR REVIEW ....................................................................1

STATEMENT OF THE CASE............................................................3

     A.    NYPD TASERS PAUL, AN EMOTIONALLY DISTURBED PERSON; HE DIES AT NORTH BRONX CENTRAL HOSPITAL................................................................................4

     B.    NYPD TASERED PAUL 13 TIMES, VIOLATING THE NYPD PATROL GUIDE; NYPD REPORTS SHOW 4 TASER DARTS PENETRATED PAUL'S SKIN ............................7

     C.    A TASER HAS TWO DARTS; BOTH DARTS MUST CONTACT SKIN FOR ELECTRICAL CHARGE.............................8

     D.    DEFENDANTS' CLAIM OF INEFFECTIVE TASERS; HOSPITAL CHART AND AUTOPSY REPORT NOTE ONLY 3 TASER DARTS ON PAUL'S BODY.................................8

     E.    APPELLATE ISSUE: EXCLUDED AUTOPSY PHOTOGRAPHS OF PAUL'S NECK; INTERNAL HEMORRHAGE FROM A 4TH TASER DART, OR FROM AN IV AT THE HOSPITAL .............................................10

          1.    THE DISTRICT COURT'S RULING ...................14

     F.    APPELLATE ISSUE: DISTRICT COURT DEEMED MEDICAL EXAMINER, DR. SMIDDY, UNAVAILABLE TO TESTIFY AT TRIAL ..................................................15

          1.    THE DISTRICT COURT'S RULING ...................17

     G.    APPELLATE ISSUE: DENIAL OF PLAINTIFF'S MOTION FOR MISTRIAL; DEFENDANTS' TASER EXPERT IMPROPERLY UTILIZED 2024 STANDARDS WHEN THE INCIDENT OCCURRED IN 2015 ...........................................17

          1.    THE DISTRICT COURT'S RULING ...................21

i

H.     APPELLATE ISSUE: DISCREPANCY AS TO PATIENT TIME OF ARRIVAL; GRANT OF HOSPITAL DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE HOSPITAL ROOT CAUSE REPORT ..............................23

     1.    DISTRICT COURT GRANTED HOSPITAL DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE HOSPITAL'S ROOT CAUSE REPORT ......................................26

STANDARD OF REVIEW ..............................................28

STATEMENT OF FACTS ..............................................29

     A.    911 CALL TO NYPD CONCERNING PAUL'S BEHAVIOR .........29

     B.    ARRIVAL OF NYPD'S EMERGENCY SERVICES UNIT; PAUL SEEN NAKED AND ALONE, BARRICADED IN HIS APARTMENT ..............................................31

     C.    DETECTIVE RAMOS SAWED A HOLE IN PAUL'S APARTMENT DOOR; BLOOD ON THE SAW BLADE, AND BLOOD COMING FROM UNDER THE DOOR ..................32

     D.    BREACH OF PAUL'S APARTMENT DOOR; USE OF TASERS BY DETECTIVE DIFRANCESCA AND MCNAMARA ..............................................33

     E.    NYPD TASER REPORTS: 7 TRIGGER PULLS BY DET. DIFRANCESCA AND 6 TRIGGER PULLS BY DET. MCNAMARA ..............................................35

     F.    SOVULJ'S TESTIMONY: BOTH TASER DARTS MUST STRIKE TO CONVEY ELECTRICITY; TASER EMITS 19 PULSES OF ELECTRICITY PER SECOND ....................37

     G.    NYPD REPORTS BY DIFRANCESCA AND MCNAMARA: ALL FOUR TASER DARTS PENETRATED PAUL'S SKIN; ONLY 3 DARTS FOUND ON PAUL'S BODY ..............................................38

     H.    READ-BACK OF DR. SMIDDY'S DEPOSITION TESTIMONY ..............................................39

SUMMARY OF LEGAL ARGUMENT ..............................................42

POINTS OF LAW ................................................................43

POINT I

THE DISTRICT COURT'S RULINGS EXCLUDING THE AUTOPSY PHOTOGRAPHS OF INTERNAL HEMORRHAGING IN DECEDENT PAUL'S NECK AND DEEMING DR. SMIDDY UNAVAILABLE TO TESTIFY AT TRIAL, ARE INEXTRICABLY LINKED AND WERE IRRATIONAL AND MANIFESTLY ERRONEOUS ....................................................43

A.    INTERNAL HEMORRHAGING IN THE NECK: INJURY FROM THE FOURTH TASER PRONG OR IV LINE ....................45

B.    THE DISTRICT COURT'S ERROR IN RULING DR. SMIDDY UNAVAILABLE TO TESTIFY AT TRIAL.....................49

POINT II

THE DISTRICT COURT COMMITTED MANIFEST ERROR IN DENYING PLAINTIFF'S MOTION FOR A MISTRIAL; DR. KROLL SUBSTITUTED A 2024 STANDARD FOR TASER USE IN PLACE OF THE 2015 STANDARD IN EFFECT AT THE TIME OF INCIDENT, AND PROFFERED UNRELIABLE TESTIMONY CONCERNING A PURPORTED SCIENTIFIC STUDY ........................................................................54

A.    DR. KROLL'S IMPROPER SUBSTITUTION OF 2024 STANDARDS FOR THE 2015 NYPD STANDARD IN EFFECT AT THE TIME OF INCIDENT .........................................55

B.    DR. KROLL'S UNRELIABLE, IPSE DIXIT TESTIMONY: PURPORTED MILITARY STUDY OF TASER USE ......................60

POINT III

THE DISTRICT COURT COMMITTED MANIFEST ERROR IN GRANTING THE HOSPITAL DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THEIR ROOT CAUSE REPORT; CHRONOLOGY AND FACTUAL STATEMENTS IN THE ROOT CAUSE REPORT WERE ADMISSIBLE AS AN OPPOSING PARTY STATEMENT, AND WERE NOT PRIVILEGED .................................................................62

A.  THE HOSPITAL DEFENDANTS' ROOT CAUSE REPORT
    SUPPORTS PAUL'S ARRIVAL AT 12:46 A.M., AND NO
    TREATMENT UNTIL CARDIAC ARREST AT 1:20 A.M. ............63

B.  THE ROOT CAUSE REPORT AS THE HOSPITAL
    DEFENDANTS' STATEMENT; COUNSEL'S BINDING
    ADMISSION ........................................................................64

C.  DISTRICT COURT'S MANIFEST ERROR: EXCLUSION
    OF THE REDACTED ROOT CAUSE REPORT BECAUSE
    PLAINTIFF DID NOT PROVE IT WAS A PARTY
    STATEMENT UNDER RULE 801(d)(2) .........................................65

D.  THE FACTUAL STATEMENTS IN THE ROOT CAUSE
    REPORT ARE NOT PRIVILEGED; THE DISTRICT
    COURT DID NOT ADDRESS PRIVILEGE ....................................70

CONCLUSION ....................................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amorgianos v. Amtrak*,
　303 F.3d 256 (2d Cir. 2002) ...................................................55

*Aqui Stoli Shipping Ltd. v Gardner Smith Pty Ltd.*,
　460 F.3d 434 (2d Cir. 2006) ................................... 28-29, 62

*Bustamante v. KIND, LLC*,
　100 F.4th 419 (2d Cir. 2024) ...............................................55

*Cuellar v. Love*,
　2014 U.S. Dist. Lexis 96988 (S.D.N.Y. 2014)............... 58-59

*Duke v. County of Nassau*,
　63 F. Appx. 558 (2d Cir. 2003) ...........................................28

*Francis v. United States*,
　2011 U.S. Dist. LEXIS 59762 (S.D.N.Y. 2011) ......................... 71, 72

*Hester v. BIC Corp.*,
　225 F.3d 178 (2d Cir. 2000) ......................................... 29, 70

*Hoodho v. Holder*,
　558 F.3d 184 (2d Cir. 2009) ................................................65

*Hygh v. Jacobs*,
　961 F.2d 359 (2d Cir. 1992) ................................................59

*Irwin v. Dep't of Veterans Affairs*,
　498 U.S. 89 (1990) ..............................................................65

*Jaquez v. Flores*,
　2016 U.S. LEXIS 34517 (S.D.N.Y. 2016) .........................71

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999) ...................................................... 55, 59

*Morshed v. St. Barnabas Hosp.*,
　2017 U.S. Dist. Lexis 19610 (S.D.N.Y. 2017)................ 71, 72

*Nimely v. City of New York*,
　414 F.3d 381 (2d Cir. 2005) ................................... 28, 60, 61

v

*Ravo v. Rogatnick,*
    70 N.Y.2d 305 (1987) ........................................................................71

*S. Leo Harmony, Inc. v. Binks Mfg. Co.,*
    597 F. Supp. 1014 (S.D.N.Y. 1984) ....................................................67

*Seridge v. Bay Street, LLC,*
    2012 U.S. Dist. Lexis 4038 (E.D.N.Y. 2012) ....................................59

*Shaeed v. Kroski,*
    2020 U.S. App. Lexis 35023 (2d Cir. 2020) ............................... 29, 62

*Showers v. Pfizer, Inc. (In re Pfizer Inc. Sec. Litig.),*
    819 F.3d 642 (2d Cir. 2016) ...............................................................62

*Skinner v. City of New York,*
    2017 U.S. Dist. Lexis 104650 (E.D.N.Y. 2017)..................................29

*United States v. Carson,*
    52 F.3d 1173 (2d Cir. 1995) ...............................................................28

*United States v. Insana,*
    423 F.2d 1165 (2d Cir. 1970) .............................................................52

*United States v. Jamil,*
    707 F.2d 638 (2d Cir. 1983) ......................................................... 28, 48

*United States v. LaFlam,*
    369 F.3d 153 (2d Cir. 2004) ...............................................................48

*United States v. Mackey,*
    2023 U.S. Dist. Lexis 40796 (E.D.N.Y. 2023)....................................29

*United States v. Thomas,*
    2000 U.S. App. Lexis 2224 (2d Cir. 2000) ........................................52

*United States v. Won,*
    2024 U.S. App Lexis 4628 (2d Cir. 2024) ....................... 28, 45, 50, 53

*Warr v. Liberatore,*
    853 Fed. Appx. 694 (2d Cir. 2021) ................................. 28, 45, 50, 53

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1) ............................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

28 U.S.C. § 1367(a) ..................................................................... 1

42 U.S.C. § 1983 ..................................................................... 3, 71

Fed. R. Civ. P. 30(b)(6) ...................................................... *passim*

Fed. R. Evid. 702 ....................................................... 55, 59, 60

Fed. R. Evid. 801(d)(2) ...................................................... *passim*

Fed. R. Evid. 804(a)(3) ...................................................... *passim*

## JURISDICTIONAL STATEMENT

This is an appeal from a final Judgment, entered on July 22, 2024 by The Hon. Vernon S. Broderick, upon a jury verdict in favor of Defendants-Appellees. S.A. 1.

Jurisdiction below was based on 28 U.S.C. § 1331. The District Court had jurisdiction because one or more of the Plaintiff's claims arises under "the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331. The District Court had supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. §§1367(a).

Plaintiff timely filed a Notice of Appeal on August 19, 2024, to appeal from the final Judgment as well as certain pre-trial orders. A. 3620.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## ISSUES FOR REVIEW

1. Whether the District Court as the trial court erred in granting defendants' trial motion to exclude from introduction into evidence two photographs marked Exhibit 34 (Path. 190 and Path. 191), taken of decedent Anthony Andre Paul during an autopsy.

2. Whether the District Court as the trial court erred in granting the Police Officer defendants' trial motion to deem and/or determine Dr. Monica Smiddy as

-1-

"unavailable" to testify at trial, where Dr. Smiddy previously served as the City's Medical Examiner who performed the autopsy upon decedent Anthony Andre Paul.

3.     Whether the District Court as the trial court erred in denying plaintiffs' trial motion for a mistrial with respect to the Police Officer defendants' use of an expert witness, who:

A.     Improperly testified to a 2024 standard for discharging a taser on an individual, instead of New York City Police Department standards in effect in July 2015, when the underlying incident occurred[1];

B.     Implicitly communicated to the jury, a legal standard as to excessive force in discharging a taser on an individual;

C.     Provided unreliable, ipse dixit testimony concerning a purported military study at Pennsylvania State University as to the use of tasers upon "anesthetized swines" for "30 minutes of exposure."

4.     Whether the District Court as the trial court erred in granting the motion *in limine* of defendants North Central Bronx Hospital and Health & Hospitals Corporation, to preclude plaintiffs from introducing a redacted Root Cause Analysis Report, as to certain statements therein *inter alia*, the time listed for patient arrival as

---

[1] A. 2858.

-2-

"0045", and "the triage nurse and Attending physician went to assess the patient immediately upon arrival."[2]

## STATEMENT OF THE CASE

The instant action alleges that decedent Anthony Andre Paul II died due to excessive force committed by New York City Police Officers ("Police Officer Defendants") and subsequent medical malpractice by defendant North Central Bronx Hospital and New York City Health and Hospitals Corporation ("Hospital Defendants").

The Second Amended Complaint alleges *inter alia* causes of action pursuant to 42 U.S.C. 1983 for violation of decedent Paul's civil rights under the Fourth Amendment, *Monell* violations, medical malpractice and wrongful death.

Prior to trial, the District Court granted summary judgment to defendant City of New York only, "as to Plaintiff's claims for unlawful entry and *Monell* liability."[3]

On June 4, 2024, upon trial against the Police Officer Defendants and the Hospital Defendants, the jury returned a verdict in favor of all defendants. Specifically, the jury found no excessive force and no medical malpractice.[4] The

---

[2] A. 385.

[3] A. 289-292, 299.

[4] A. 3474-3477.

instant appeal concerns prejudicial evidentiary errors made by the District Court — during trial and in pre-trial rulings.

Our Statement of the Case provides a summary of facts directly applicable to the issues on appeal. Further factual context is contained in our Statement of Facts.

The underlying incidents addressed in this appeal occurred on July 1, 2015 through and into July 2, 2015.

## A. NYPD TASERS PAUL, AN EMOTIONALLY DISTURBED PERSON; HE DIES AT NORTH BRONX CENTRAL HOSPITAL.

On July 1, 2015, decedent Paul was a resident of a three-quarter facility in Bronx, NY. At such time, a call was made to 911 regarding Paul as an Emotionally Disturbed Person ("EDP") who had barricaded himself in his own apartment. NYPD's Emergency Services Unit ("ESU") arrived on scene, inserted cameras into Paul's apartment, observed that he was naked and in an emotionally disturbed state.[5]

The ESU officers used a Sawzall saw to cut a hole in Paul's apartment door, and then breached the apartment door, entered the apartment and "used excessive physical force and unnecessary electric current (tasers) to arrest him and take him into custody."[6]

---

[5] A. 80-81. Second Amended Complaint ("SAC") , para. 41-45; A. 1744-1748; 1754-1758.

[6] A. 82. (SAC para. 55).

-4-

Paul was subsequently transported by ambulance to defendant North Bronx Central Hospital, where he died.[7] The New York City Medical Examiner's Autopsy Report listed cause of death as: "Cardiac arrhythmia due to agitated delirium (probable drug intoxication.)" A. 3561 [Exhibit 33].

At trial, plaintiff's medical expert, Dr. Evan Cohen, explained that agitated delirium or hyperactive delirium "is a combination of signs and symptoms. The causes may be various, but the end result is a delirious state, which means that the person is not in touch with reality, and then multiple other signs, such as excessive strength, dilated pupils, fast heart rate, elevated blood pressure, sometimes low blood sugar, and again, the causes are multiple, but they typically will share overlapping signs and symptoms."[8]

Dr. Cohen linked Paul's death from agitated delirium to the tasers used by the Police Officer Defendants on Paul. Dr. Cohen testified that when a person is "tasered, they may have increased muscle contraction from those tasers, and that may increase lactic acid" in the blood, causing acidosis.[9]

---

[7] A. 3572-3619; 3586 (Exhibit BB).

[8] A. 2452.

[9] A. 2471-2472; 2452-2453.

-5-

Dr. Cohen opined that acidosis was a contributing and/or exacerbating factor of Paul's agitated delirium, testifying:

> "I believe that acidosis was a factor in his hyperactive delirium. Whether it makes the actual delirium worse, I believe it would, but I can't say that acidosis alone would contribute to hyperactive delirium."[10]

Dr. Cohen further opined that the Hospital Defendants deviated from the standard of care in: 1) failing to timely treat Paul; and 2) failing to administer immediate sedation to alleviate the agitated delirium, stabilize him and thereby save his life.[11]

Dr. Cohen opined, "I believe giving Mr. Paul a sedative would have saved his life."[12] According to Dr. Cohen, "A sedative...would have allowed medications to be given such as IV fluids. It would have allowed a full set of vital signs, which may have identified or would have identified hemodynamic instabilities, so abnormalities with blood pressure, heart rate, the temperature that are very treatable...."[13]

---

[10] A. 2472.

[11] A. 2432-2433; 2437-2441; 2445-2446.

[12] A. 2478.

[13] A. 2478.

-6-

Thus, Dr. Cohen opined, "A sedative would have allowed a rapid diagnostic evaluation with blood work to identify elevated potassium, EKGs to identify cardiac arrhythmias, and allow treatment to ensue."[14]

Dr. Cohen concluded, "[T]hose are the main reasons that I feel that a sedative would have given Mr. Paul an opportunity to have not died that day." A. 2479.

## B. NYPD TASERED PAUL 13 TIMES, VIOLATING THE NYPD PATROL GUIDE; NYPD REPORTS SHOW 4 TASER DARTS PENETRATED PAUL'S SKIN.

The NYPD Patrol Guide for taser use, in effect for July 2015, was introduced into evidence at trial as Exhibit 6. It explicitly stated: "In no situation will more than three standard discharge cycles be used against any subject."[15]

The Second Amended Complaint alleges defendants Detective DiFrancesca and Detective McNamara violated the NYPD Patrol guide and tasered Paul a total of 13 times. A. 83 (SAC para. 56). NYPD Taser reports introduced at trial showed defendant Detective DiFrancesca fired his taser 7 times, and defendant Detective McNamara fired his taser 6 times.[16]

---

[14]A. 2478-2479.

[15] A. 3552 [Exhibit 6].

[16] A. 3478, 3532; 3533, 3542 [Exhibits 1 and 2].

Detectives DiFrancesca and McNamara filed NYPD reports, which stated that each of their tasers fired 2 taser darts, both making contact with and penetrating Paul's skin.[17] Hence, according to their reports, a total of 4 taser darts struck Paul and penetrated his skin.

### C. A TASER HAS TWO DARTS; BOTH DARTS MUST CONTACT SKIN FOR ELECTRICAL CHARGE.

Plaintiff's Exhibit 80 is a photograph of two taser guns with taser cartridges. A.3570. Testimony at trial demonstrated: 1) a taser cartridge simultaneously shoots two darts at a subject[18]; and 2) both darts must contact the subject's skin and/or clothing for an electrical charge to flow into the subject's body.[19] The electrical charge causes involuntary muscle contractions, incapacitating the subject who falls to the ground.[20]

### D. DEFENDANTS' CLAIM OF INEFFECTIVE TASERS; HOSPITAL CHART AND AUTOPSY REPORT NOTE ONLY 3 TASER DARTS ON PAUL'S BODY.

Despite firing their tasers for a total of 13 times at Paul, Detectives DiFrancesca and McNamara claimed they did not use excessive force against Paul. They blamed

---

[17] A. 3556-3559 [Exhibits 15 and 16].

[18] A. 1539-1540.

[19] A. 1541-1542.

[20] A. 1539-1540.

their conduct on purportedly ineffective tasers.[21]  Although they pulled their tasers' triggers for a combined 13 times, these detectives testified the tasers seemingly had no effect on Paul as he was not incapacitated by the taser charges.[22]     The detectives' NYPD reports documented that all four taser darts (2 darts per taser) made contact with and penetrated Paul's skin.[23]  A pair of two darts from a given taser are required for electricity to flow into a subject's body.[24]  Therefore,  each pair of taser darts — from the two tasers — should have incapacitated Paul.    While the detectives specified 4 taser darts struck and embedded in Paul's skin, the hospital chart and autopsy report note the presence of only 3 taser darts on Paul's body: right shoulder, right knee and left thigh.[25]

---

[21] A. 1287, 1296, 1297; A. 1364.

[22] A. 1217-1219, 1222, 1275-1280; A. 1364-1365.

[23] A. 3556, 3558.

[24] A. 1541-1542.

[25] A. 3564; 3582 [Exhibit 33; Exhibit BB].

### E. APPELLATE ISSUE: EXCLUDED AUTOPSY PHOTOGRAPHS OF PAUL'S NECK; INTERNAL HEMORRHAGE FROM A 4TH TASER DART, OR FROM AN IV AT THE HOSPITAL.

A critical issue at trial arose from the missing fourth taser dart and an area of internal hemorrhaging within decedent Paul's neck as documented by the autopsy report and two autopsy photographs.

Under the heading of "Therapeutic Procedures", the autopsy report states:

"A recent needle puncture site is noted on the right side of the neck. There is associated underlying subcutaneous and superficial muscular hemorrhage."[26]

Dr. Smiddy, the medical examiner who performed the autopsy and wrote the autopsy report, explained that a subcutaneous hemorrhage is "a small amount of bleeding associated with the puncture site."[27]

The hospital chart from North Central Bronx Hospital, however, does not contain any notation of a "therapeutic procedure" at or about Paul's neck, such as an IV line requiring a needle puncture. A. 3572-3619 [Exhibit BB]. Moreover, Dr.

---

[26] A. 3563 [Exhibit 33].

[27] A. 2966 (read-back of Dr. Smiddy's prior deposition testimony as discussed infra).

-10-

Smiddy did not observe an IV in decedent Paul's neck, despite categorizing the puncture site in the neck as from a therapeutic procedure.[28]

Due to the missing fourth taser dart, and the contradiction between the autopsy report and the hospital record, counsel for decedent Paul sought to introduce into evidence two autopsy photographs designated as "Path. 190'" and "Path. 191", of internal hemorrhaging in the area of Paul's neck. These two photographs were to be introduced into evidence as Exhibit 34 and are in the Appellate Appendix at A. 3568-3569.[29]

In discussing admissibility of these two photographs, plaintiff's attorneys advised the Court that "On page 367 of Dr. Smiddy's [deposition] testimony, she testifies specifically about the injury, the hemorrhage under the skin. That's where the testimony is" and the autopsy report "notes a puncture wound in the neck. That is where the photo comes from." A. 2779.

---

[28] A. 2965-2966 (read-back of Dr. Smiddy's prior deposition testimony as discussed infra).

[29] Although the District Court admitted into evidence an autopsy photograph of decedent Paul's neck (Exhibit 35BBB), this photograph is of the exterior skin portion of the neck and does not show internal hemorrhaging. See, A. 3571. Further, review of this photograph by the naked eye shows nothing more than two red dots on the exterior skin portion of the neck.

-11-

The Court then referred to Dr. Smiddy's deposition transcript as shown in the following colloquy:

> Ms. Brown [plaintiff's counsel]: This is Exhibit 34.
>
> The Court: What is —
>
> Ms. Brown: The testimony is at page 367.
>
> The Court: Okay. Hold on. 367. It's Path. 191.
>
> Ms. Brown: It's two photos in the exhibit.
>
> Ms. Faddis [counsel for Police Officer Defendants] It's two photos.
>
> Ms. Brown: One is Path. 190 and one is Path. 191. They are both part of Exhibit 34.[30]
>
> &ast;&ast;&ast;
>
> The Court: 367?
>
> Ms. Brown: Yes. 367. It starts at line 5 and goes through line 25.
>
> The Court: All right.[31]

Page 367 of Dr. Smiddy's deposition indeed shows that she identified the photographs of Path. 190 and 191 as hemorrhaging from a puncture wound in the neck:

> Q:   Okay. Now 190. This is a photograph of Mr. Paul, where you cut open his – the skin on his neck; is that correct?

---

[30] A. 2782.

[31] *Id.*

-12-

A:      Yes.

Q:      Can you show us, on this photograph, where the hemorrhage occurred from, the puncture wound that was on the right side of his neck; can you show us on that photograph?

(The witness is indicating on the computer screen).

Q:      Okay.

Mr. Sells: Pointing to the lower part of Mr. Paul's neck.

Q:      And you could tell that was where the hemorrhage occurred because there is blood there, correct?

A:      Yes.

Ms. Correa: Path Autopsy 191.

Q:      That's a closer-up of that hemorrhaged puncture wound, correct?

A:      Yes.[32]

The Court initially allowed one of the photographs into evidence, Path. 191, but excluded Path. 190.[33] This prompted counsel for defendants to argue that Dr. Smiddy's autopsy report described the puncture wound in the neck as "a therapeutic intervention during the cardiac arrest", not a taser wound. A. 2783.

Counsel for decedent Paul responded:

_____

[32] ECF Doc. 291-6, at page 367.

[33] A. 2783.

-13-

"[T]here is no evidence in the medical chart of medical intervention at that level [i.e. the neck]. Then the officers' testimony about the Taser prongs connecting would leave a jury to decide whether or not that is, or is not, where the fourth taser prong went. Clearly the officers testified and stood by their reports."[34]

\*\*\*

"There is absolutely no mention in the hospital record of any medical intervention in that area [i.e. the neck]. You saw the flowchart. It certainly didn't mention anything about an IV to the neck."[35]

Counsel for decedent Paul further asserted that since the detectives' NYPD reports showed "four taser darts that connected...it is for the jury to decide whether or not there was a therapeutic intervention [in the neck] or whether this was a Taser prong."[36]

Moreover, as counsel for decedent Paul explained, "Dr. Smiddy wasn't given the Taser reports, so she didn't have the knowledge: Oh, maybe I need to be looking for another prong, since these officers said that there were four and that all four connected. So where is the other one?" A. 2788.

## 1.  THE DISTRICT COURT'S RULING.

Upon the parties' arguments, the District Court excluded the autopsy photographs of Path. 190 and 191, showing internal hemorrhaging in decedent Paul's

---

[34] A. 2785.

[35] A. 2788.

[36] A. 2784-2785.

-14-

neck.[37] In excluding the autopsy photographs of the internal hemorrhaging in decedent Paul's neck, the District Court held:

> "I am just looking at the testimony that you just cited.
>
> Again, without any testimony from Dr. Smiddy saying what these injuries are...It is not married to her testimony, at least that I've seen, and there appears to be ambiguity about exactly what she actually said about this in the first place. So in terms of 190 and 191 [marked as Exhibit 34], I find that under [Rule] 403 the probative value is insufficient to justify the prejudice that the jury would have from the photographs...[T]hat's Exhibit 34."[38]

Point I of our legal argument addresses the District Court's error, and the prejudicial effect upon plaintiff's case due to such evidentiary exclusion.

## F. APPELLATE ISSUE: DISTRICT COURT DEEMED MEDICAL EXAMINER, DR. SMIDDY, UNAVAILABLE TO TESTIFY AT TRIAL.

Throughout the trial, the parties and the District Court had extensive submissions and argument as to whether Dr. Smiddy was to be deemed "unavailable" to testify at trial under Rule 804(a)(3).[39] She was the medical examiner who performed the autopsy upon decedent Paul in 2015. At the time of trial in May 2024, Dr. Smiddy had already retired from her employment with the City of New York, and

---

[37] A. 2790.

[38] A. 2790.

[39] A. 459-464; A. 471, 473-476; A. 1316-1319; A. 1634-1635.

-15-

therefore the District Court "decline[d] to Order the Officer Defendants to produce Dr. Smiddy."[40]

Counsel for decedent Paul subpoenaed Dr. Smiddy to testify at trial.[41] After further discussion of the issue, the District Court issued an Order for Dr. Smiddy to submit "a sworn statement regarding the reasons why she believed she should not be required to testify" and answer specific questions contained in the Order. A. 1318-1319.

In response, Dr. Smiddy submitted a Declaration stating she retired in 2019, last reviewed her autopsy report and materials in the *Paul* matter "sometime prior to my retirement in 2019...most likely around the time of my deposition", and her "memory of this particular case, including the autopsy report...is vague."[42] In her Declaration, Dr. Smiddy also stated:

> "I have problems related to cognitive impairment which prompted my recent move into a Continuing Care Retirement Community. My memory is no longer sharp...I am having word-finding difficulty. I have trouble with concentration. I have not received a medical diagnosis at this time."[43]

_____

[40] A. 459.

[41] A. 442.

[42] A. 1634-1635.

[43] A. 1634-1635.

No medical records, physician's letter or Declaration accompanied Dr. Smiddy's Declaration.

### 1. THE DISTRICT COURT'S RULING.

The District Court did not require Dr. Smiddy to testify in court and/or be questioned under oath as to her claimed unspecified "problems related to cognitive impairment...."[44] Based upon her bare Declaration alone, without any medical proof, the District Court ruled "Dr. Smiddy is unavailable under Federal Rule of Evidence 804(a)(3)."[45]

Point I of our argument section addresses the District Court's error in this regard, as it prejudiced decedent Paul in his ability to prove excessive force against the Police Officer Defendants.

### G. APPELLATE ISSUE: DENIAL OF PLAINTIFF'S MOTION FOR MISTRIAL; DEFENDANTS' TASER EXPERT IMPROPERLY UTILIZED 2024 STANDARDS WHEN THE INCIDENT OCCURRED IN 2015.

The NYPD Patrol Guide for taser use, in effect for July 2015, was introduced into evidence at trial as Exhibit 6. It explicitly stated: "In no situation will more than three standard discharge cycles be used against any subject."[46]

---

[44] A. 2595.

[45] A. 2595.

[46] A. 3552 [Exhibit 6].

On the plaintiff's case-in-chief, counsel for decedent Paul took testimony from NYPD Police Officer Josip Sovulj, a 30(b)(6) witness for the Police Officer Defendants on taser use by the NYPD. Sovulj testified that the standard taser electricity discharge "is a five-second cycle." A. 1469. He further testified that under the NYPD Patrol Guide in effect in 2015, three taser discharges at five seconds apiece was the maximum number of taser discharge cycles that should be used against a person:

> Q: Now, you know that the guidelines back in 2015 prohibited more than three standard cycles of taser use against an individual, right?
>
> Ms. Faddis: Objection to the form.
>
> The Court: Sustained.
>
> Q: What is your understanding of the maximum number of cycles that the taser should be used against an individual?
>
> A: Well, if the officer perceived that the cycle is being effective, then it should not exceed three cycles or 15 seconds of exposure if you know that the taser is actually delivering effective utilization of the taser on the subject.
>
> Q: You're saying that's what the guide says?
>
> Ms. Faddis: Objection.
>
> The Court: I will allow that. Overruled.
>
> A: What's the question?
>
> Q: That's what the patrol guide said?

-18-

> A:     The patrol guide says do not exceed 15 seconds of utilization on a subject.[47]

Thus, under the NYPD's own standard in 2015, a police officer was limited to discharging a taser for three cycles at five seconds apiece or 15 seconds in total.

In contravention of their own 30(b)(6) witness, the Police Officer Defendants proffered a taser expert who improperly substituted 2024 standards for discharging taser darts upon an individual, instead of NYPD standards in effect in July 2015, when the *Paul* incident occurred.

The defense taser expert, Mark Kroll, Ph.D., testified in this regard as follows:

> **Q:     I want you to assume that the jury has heard that NYPD guidelines in 2015 instructed officers not to use more than three standard discharge cycles against any subject. Are you familiar with that type of guidance in the context of taser use?**
>
> Mr. Sells [plaintiff's counsel]: Objection, your Honor.
>
> The Court: I will allow it. Overruled.
>
> **A:     The baseball rule was popular 10, 15 years ago. It's obsolete.**
>
> Mr. Sells: Objection, your Honor.
>
> The Court: Sustained.
>
> **Q:     Doctor you referred to the baseball rule. Is there a scientific rationale behind that type of guidance with regard to tasers?**

---

[47] A. 1570.

-19-

Mr Sells: Objection, your Honor.

The Court:   I'll allow it.  Go ahead.

**A:** **No.  Because it implies that 15 seconds of electronic muscle control is safe and 16 seconds could be dangerous, which is, frankly, silly when we have the FDA approving stronger muscle stimulators up to 40 minutes.  So it really should be minutes, not seconds.**[48]

Upon such testimony, counsel for plaintiff moved for an immediate mistrial because the Police Officer Defendants' taser expert opined upon current standards in 2024 as opposed to using the standards in 2015 when the *Paul* incident occurred.

Plaintiff's motion for a mistrial is as follows:

**Mr. Sells:** **...There has been a 30(b)(6) witness who has testified as to what the standards were at the time that Mr. Paul was tasered.  This witness that's now coming in to talk about what the standards are today undermines that complete admission that binds the officer defendants in this case.**

**I am asking for an immediate mistrial because it's so prejudicial, it goes directly to whether or not there was excessive force used.  And for him to mock the three taser rule is so prejudicial that I am asking for an immediate mistrial.  The 30(b)(6) witness bound this party to what the standards were. And for this testimony to come out is not appropriate, your Honor.**[49]

***

**The Court: That is denied....** [50]

---

[48] A. 2856-2857.

[49] A. 2858.

[50] A. 2859.

-20-

\*\*\*

**The Court: With regard to the NYPD patrol guide, the doctor has not denied their existence. He is just explaining what the science is behind the use of tasers.[51]**

**Mr. Sells: He mocked, literally mocked those rules. I don't recall his exact words. I am sure you Honor can pull it up, but he mocked the rules. He was saying, oh, it's like the old baseball rule...The point is the cat is out of the bag right now and this jury has been told that those rules are meaningless.[52]**

\*\*\*

**Mr. Sells: ...[T]he point is that this witness has come on to the stand, over objection, and testified that those rules are basically meaningless given today's science. Because he is using not from the science in 2015 when this case happened, he is talking about now....[53]**

### 1.   THE DISTRICT COURT'S RULING.

The District Court denied the plaintiff's motion for a mistrial. A. 2859. As discussed in Point II of our argument section, decedent Paul was continuously prejudiced by the District Court's denial of a mistrial. The jury heard the Police Officer's taser expert testify the 2015 standards were "obsolete"[54], and therefore meaningless.

---

[51] A. 2860.

[52] A. 2860.

[53] A. 2861.

[54] A. 2856.

-21-

The Court did advise that "To the extent that there was an answer that dealt with what the standards are today, I will take a look at that and that testimony will be stricken."[55] However, there was never any such ruling or instruction to the jury by the Court.

Even where counsel for the Police Officer Defendants asked Dr. Kroll specifically about the 2015 standard for taser use, Dr. Kroll provided unreliable, conclusory testimony concerning a purported military study at Pennsylvania State University as to the use of tasers upon "anesthetized swines" for "30 minutes of exposure."[56] Dr. Kroll never provided any details or supporting evidence for his testimony.

Finally, counsel for the Police Officer Defendants improperly embraced Dr. Kroll's use of a 2024 standard, asking him outright whether "Since 2015, taser technology has changed?"[57]

Over objection, Dr. Kroll responded, "Yes...The models they sell now have ten probes, and typically an officer will launch four or five, six probes, so they have at

---

[55] A. 2861.

[56] A. 2865.

[57] A. 2865.

-22-

least four connected probes. So they will go well beyond three trigger pulls because they launch four, five, six, they pull the trigger four, five, six times.[58]

### H. APPELLATE ISSUE: DISCREPANCY AS TO PATIENT TIME OF ARRIVAL; GRANT OF HOSPITAL DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE HOSPITAL ROOT CAUSE REPORT.

Plaintiff asserted a cause of action for medical malpractice against the Hospital Defendants, arising out of departures from standards of care in failing to treat Paul until he went into cardiac arrest and died.

An ambulance transported Paul from his apartment at Narco Freedom to North Central Bronx Hospital. A central dispute as to departure from a standard of care arose from a discrepancy in the hospital record concerning the patient time of arrival. The hospital record contained two different ambulance reports: 1) an FDNY ambulance Prehospital Care Report Summary ("FDNY Ambulance Report")[59]; and 2) an EMS 911 System Provider Call Report ("EMS Report").[60]

The FDNY Ambulance Report listed the arrival time "At Destination" as "00:46:24" — meaning 12:46:24 a.m. A. 3578. The EMS Report — of a different

---

[58] A. 2865-2866.

[59] A. 3578-3579.

[60] A. 3597.

-23-

ambulance entirely — listed "At Destination" as "00:58", meaning 12:58 a.m. A. 3597.

The Emergency Department triage note by Nurse Matira was signed at 1:00 a.m.[61] Nurse Matira testified that 1:00 a.m. is "when I had first contact with the patient." A. 2361. She also testified that based upon her triage note, 1:00 a.m. is when the patient arrived in the Emergency Department. A. 2405.

The "Objective Findings" in Nurse Matira's triage note of 1:00 a.m. stated *inter alia* that Paul was "agitated" and she was "unable to obtain" vital signs such as blood pressure, heart-rate and temperature.[62]

Nurse Matira testified that her triage note listed Paul as "Class 2", meaning "high risk patients...suicidal...combative and agitated...confused...need immediate medical attention."[63] Likewise, Nurse Matira testified that when Paul arrived in the Emergency Department "he was talking, screaming...combative...He was covered in blood. He was handcuffed...." A. 2396.

Based upon arrival at destination at 12:46 a.m. per the FDNY Ambulance Report, plaintiff's medical expert, Dr. Cohen, opined the triage time of 1:00 a.m "was

---

[61] A. 3580 [Exhibit BB].

[62] A. 3580 [Exhibit BB].

[63] A. 2352-2353; 2367.

-24-

a departure from the standard of care."[64] Dr. Cohen explained that "triage should be accomplished within the first ten minutes of arrival to the hospital, and quicker than that for a patient who is in extremis or obviously critical condition." A. 2432-2433.

Accordingly, based upon Paul's presentation in the Emergency Department and inability to obtain his vital signs, Dr. Cohen opined "The vital signs need to obtained emergently, especially in a critical patient. And the patient should have had sedation to facilitate the evaluation of the patient...." A. 2437-2438.

Dr. Cohen opined, "I believe giving Mr. Paul a sedative would have saved his life."[65] According to Dr. Cohen, "A sedative...would have allowed medications to be given such as IV fluids. It would have allowed a full set of vital signs, which may have identified or would have identified hemodynamic instabilities, so abnormalities with blood pressure, heart rate, the temperature that are very treatable...." A. 2478.

No such sedative was administered to Paul.[66] Moreover, there are no treatment notes in the hospital record from triage at 1:00 a.m. until cardiac arrest at 1:20 a.m. Paul died at 1:39 a.m. when CPR was unsuccessful per the hospital record. A. 3586 [Exhibit BB].

---

[64] A. 2432-2433.

[65] A. 2478.

[66] A. 3055-3056, 3067-3068.

### 1. DISTRICT COURT GRANTED HOSPITAL DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE HOSPITAL'S ROOT CAUSE REPORT.

Due to the discrepancy between the FDNY Ambulance Report and the EMS Report, an issue at trial arose as to:

A. Whether Paul arrived in the Emergency Department at or about 12:46 a.m., and was not seen by the triage nurse until 14 minutes later at 1:00 a.m.; or

B. Whether he arrived in the Emergency Department at or about 12:58 a.m., and seen by the triage nurse only two minutes later at 1:00 a.m.

This discrepancy is directly related to Dr. Cohen's opinion that based upon the FDNY Ambulance Report with Paul's arrival at 12:46 a.m., the Hospital Defendants departed from the standard of care in failing to triage and treat Paul in a timely manner. A. 2432-2433.

Prior to trial, the Hospital Defendants moved *in limine* to exclude from evidence the Hospital Defendants' Root Cause Report[67], which stated that Paul arrived in the Emergency Department at 12:45 a.m. The Root Cause Report, therefore, was consistent with the FDNY Ambulance Report and countered the discrepant EMS Report.

---

[67] A. 301-309.

-26-

The Root Cause Report, as redacted by plaintiff's counsel, stated as follows:

"0045: The patient arrived in the Adult Emergency department on a stretcher accompanied by EMS and 4 NYPD officers...The triage nurse and Attending physician went to assess the patient immediately upon arrival."[68]

\*\*\*

"The ED Attending and nursing staff assessed the patient immediately upon arrival and never left his bedside."[69]

In their motion *in limine*, the Hospital Defendants sought exclusion of their Root Cause Report upon the quality assurance privilege in medical malpractice actions under New York State statutes.[70]

Plaintiff opposed the motion, arguing: 1) it would only use the Root Cause Report as party "admissions" of *facts* — "what time Mr. Paul was first seen by the ER doctor and nurse on July 2, 2015"[71]; 2) such *facts* are not privileged under federal law since it "relate[s] to both the Federal and State claims on damages and causation"[72];

---

[68] A. 385.

[69] *Id.*

[70] A. 301, 303-307.

[71] A. 376.

[72] A. 376.

-27-

and 3) "findings or conclusion reached by the authors"[73] would be redacted from the report.

By Order, entered May 6, 2024, the District Court granted the Hospital Defendants' motion *in limine* and thereby excluded the Root Cause Report from introduction into evidence. A. 443-446. Point III of our argument section addresses the District Court's error in granting the Hospital Defendants' motion *in limine*.

## STANDARD OF REVIEW

Appellate review for abuse of discretion by the District Court applies to exclusion of the autopsy photographs, deeming Dr. Smiddy unavailable to testify at trial and denying plaintiff's motion for a mistrial due to improper expert testimony. *United States v. Carson,* 52 F.3d 1173, 1188 (2d Cir. 1995); *Duke v. County of Nassau*, 63 F. Appx. 558, 560 (2d Cir. 2003); *Nimely v. City of New York*, 414 F.3d 381, 393 (2d Cir. 2005); *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983).

Abuse of discretion by a District Court in evidentiary rulings is shown by "manifest error" in law or fact, and/or a ruling that is "arbitrary and irrational." *United States v. Won*, 2024 U.S. App Lexis 4628, *11 (2d Cir. 2024); *Warr v. Liberatore*, 853 Fed. Appx. 694, *3 (2d Cir. 2021); *Aqui Stoli Shipping Ltd. v Gardner Smith Pty Ltd.*,

---

[73] A. 378.

460 F.3d 434, 439 (2d Cir. 2006) ("[A] district court necessarily abuses its discretion when its decision rests on an error of law or a clearly erroneous finding of fact.").

This Court's review is de novo because it is "reviewing the legal predicate for an exercise of discretion...." *Id.* This Court is "especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance." *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000).

The District Court's grant of the Hospital Defendant's motion *in limine* to exclude the Root Cause Report is also reviewed for "abuse of discretion." *Shaheed v. Kroski*, 2020 U.S. App. Lexis 35032, fn 4 (2d Cir. 2020). "A court will exclude evidence on a motion *in limine* only if it is clearly inadmissible on all potential grounds." *United States v. Mackey,* 2023 U.S. Dist. Lexis 40796, *4 (E.D.N.Y. 2023); *Skinner v. City of New York*, 2017 U.S. Dist. Lexis 104650, *3 (E.D.N.Y. 2017).

## STATEMENT OF FACTS

The following facts provide the overall context for the appellate issues discussed in our Statement of the Case.

### A.    911 CALL TO NYPD CONCERNING PAUL'S BEHAVIOR.

Pursuant to a read-back of prior deposition testimony of Curtis Joseph, the events of July 1-2, 2015, began with his call to 911 because of Paul's erratic behavior.

Joseph worked at Narco Freedom, the facility in which decedent Paul resided. A. 969, 970. Joseph described it as "A three-quarter house", which provides "independent living" for those released from incarceration. A. 972, 982. Those assigned to Narco Freedom are not necessarily drug users; rather, "It just meant that they was the only bed that was available for you." A. 981, 982.

On July 1, 2015, Joseph called 911 because Paul had locked himself in his apartment and refused to open the door. A. 984-985. Joseph told 911 "we have an emergency. I have a client here that appears to be under some sort of mind altering substance." A. 985. Joseph also told the 911 operator that Paul "didn't have any weapons" and "he was nonviolent." A. 988. Joseph testified, "I made it clear to them that he was not a violent person." A. 989.

Joseph may have described Paul to the 911 operator as an "EDP", an emotionally disturbed person, because Paul "wasn't acting like himself." A. 988. Joseph further explained, "I feared that I didn't like the fact that he locked himself in the room." A. 988.

Joseph told the 911 operator, "that it appeared to be that he [Paul] was under the influence of K2.[74] I did say that because that's what I believed." A. 990. Joseph

---

[74] K2 is synthetic marijuana.

conceded that he "didn't see him get high", and had no factual basis to support the belief that Paul had used K2 prior to the incident. A. 987, 996.

### B. ARRIVAL OF NYPD'S EMERGENCY SERVICES UNIT; PAUL SEEN NAKED AND ALONE, BARRICADED IN HIS APARTMENT.

In response to Joseph's 911 call, NYPD's Emergency Services Unit and a hostage negotiator responded to the scene of Paul's apartment at Narco Freedom. A. 1738, 1759-1760. The ESU set up a pole camera outside of Paul's apartment, whereby the observed him in his apartment. A. 1744-1746. The camera showed Paul naked and masturbating near his apartment door. A. 1746-1748.

Defendant Detective DiFrancesca testified that when he arrived at Paul's apartment door, he heard continuous banging on the door. A. 1136-1137. DiFrancesca advised Paul that he was there to help. Paul cursed and used racial epithets against DiFrancesca, threatening to kill DiFrancesca if he touched the apartment door. A. 1138-1139. According to Detective DiFrancesca, Paul's conduct in this regard went on for hours. A. 1140. Defendant Detective McNamara similarly testified that he heard Paul banging on his apartment door, and that Paul said demons were coming to get him. A. 1342-1343, 1347.

-31-

**C.   DETECTIVE RAMOS SAWED A HOLE IN PAUL'S APARTMENT DOOR; BLOOD ON THE SAW BLADE, AND BLOOD COMING FROM UNDER THE DOOR.**

Defendant Detective Ramos testified that he was ordered "to cut a hole" in the apartment door, "to get a different observation" of Paul in the apartment because the scout camera "didn't focus on him at the door constantly.  It only got a certain part of the apartment."  A. 751.

After Detective Ramos cut a starter hole in Paul's apartment door, Paul "started spitting" through the hole, and Detective Ramos observed blood splatter seemingly from Paul. A. 779.  Thereafter, Detective Ramos used a Sawzall saw to enlarge the hole in Paul's apartment door, and observed blood on the Sawzall's blade after making two cuts in the door.  A. 797-798.  Defendants Detective DiFrancesca and Detective McNamara testified to observing blood oozing from underneath Paul's apartment door.  A. 1178-1179; 1361.

The Autopsy Report concerning Paul noted sharp force injuries of upper extremities, including: 1) "approximately twenty, similarly appearing, superficial incised wounds clustered on the palm and fingers" of the right hand; and 2) "eight similarly appearing...incised wounds" on the "right forearm...."  A. 3563-3564 [Exhibit 33].

### D. BREACH OF PAUL'S APARTMENT DOOR; USE OF TASERS BY DETECTIVE DIFRANCESCA AND MCNAMARA.

After observing blood come from under Paul's apartment door, defendant Detective DiFrancesca, Detective McNamara and other ESU officers breached Paul's apartment door and tasered Paul. As Detective DiFrancesca went through the apartment door, he saw Paul's face "very briefly" and observed Paul attempting "to grab for the taser." A. 1208-1209. DiFrancesca fired his taser at Paul, and then saw him on his back on the ground, masturbating. A. 1209-1215.

> Q: And when you saw Mr. Paul on the ground, you were able to see both of his hands, correct?
>
> A: Very quickly, yes.
>
> Q: And according to you, one hand was up in the air, right?
>
> A: Yes.
>
> Q: And the other hand was on his penis; is that right?
>
> A: Correct.
>
> Q: And Mr. Paul's penis you say was erect, right?
>
> A: Yes.
>
> Q: And you believed he was masturbating, right?
>
> A: Yes.[75]

---

[75] A. 1215.

-33-

Paul then attempted to stand up, and Detective DiFrancesca fired his taser a second time at Paul. A. 1217-1219. Paul fell down but kicked and punched DiFrancesca. A. 1222. DiFrancesca then fired his Taser at Paul a third time. A. 1223.

Detective McNamara testified that upon entry into Paul's apartment, it was "very dark. Mr. Paul was naked, he was sweating profusely. He had a lot of blood on him. But he was fighting with DiFrancesca with the shield." A. 1364. After Detective McNamara heard DiFrancesca's taser "go off", he observed "Mr. Paul standing up." A. 1364. Detective McNamara therefore thought DiFrancesca's taser "was not effective", and discharged his own taser against Paul. A. 1364. However, "there was no response whatsoever" by Paul, "no muscle lock", so Detective McNamara "pulled the trigger again...." A. 1364.

Detective McNamara testified that after his second taser firing, "Paul was on the ground", and other officers were attempting to control and subdue Paul. A. 1364. However, "Mr. Paul was very strong. He was pushing these guys off...His legs were kicking...." A. 1365. According to Detective McNamara, "Shortly after he was in handcuffs, and we were moving him out to EMS." A. 1365.

Detective McNamara testified, "[T]he whole thing lasted a minute to a minute 30 seconds...."[76] During such time, Detective McNamara testified he pulled the trigger on his taser to deploy darts "two to three times." A. 1376.

### E. NYPD TASER REPORTS: 7 TRIGGER PULLS BY DET. DIFRANCESCA AND 6 TRIGGER PULLS BY DET. MCNAMARA.

Defendant Detective DiFrancesca admitted that NYPD Taser records showed for the two Tasers used against Paul, one was fired 7 times, and the other was fired 6 times.

> Q:    Now, the Taser records in this case show that one of the Tasers that was used that night was fired seven times, right?
>
> A:    I believe so, yes.
>
> Q:    And the other Taser that was used was fired six times, right?
>
> A:    Correct.[77]

According to Detective DiFrancesca's "Less Lethal/CED" report, he utilized a taser bearing serial number X-00-719703. A. 3556 [Exhibit 15]. To correlate this taser used by DiFrancesca to the taser listed on an NYPD Taser Report, counsel for

---

[76]  A 1365.

[77]  A. 1227.

Paul took testimony from Josip Sovulj, a 30(b)(6) witness for the Police Officer Defendants.

Sovulj testified that the taser had an internal record of every time it is discharged. A. 1459. The recorded information will list the date and time of each taser discharge. A. 1460. Therefore, as Sovulj explained, the NYPD Taser Report for taser X-00-719703 shows that it was discharged 7 times on July 2, 2015. A. 1463; 1489-1494; 3533, 3542 [Exhibit 2]. Indeed, as Sovulj further testified concerning DiFrancesca's taser:

> Q: So there's a total of seven discharges of the particular Taser on July 2, 2015, correct?
>
> A: Correct.[78]

Sovulj provided similar testimony concerning the taser used by defendant Detective McNamara in the Paul incident. According to Detective McNamara's "Less Lethal/CED" report, he utilized a taser bearing serial number X-00-652967. A. 3558 [Exhibit 16]. Sovulj corresponded this taser to a separate NYPD Taser Report, which showed it was discharged 6 times on July 2, 2015. A. 1461-1462; 1470-1484; 3478, 3532. [Exhibit 1].

---

[78] A. 1494.

-36-

Sovulj further testified that the temperature and battery notations on the respective NYPD Taser Reports indicate that both tasers were operational on July 2, 2015 and "conducting electricity...." A. 1475-1479; 1495-1496; 1573. It does not, however, show that any such electricity was conducted into a given subject. *Id.*

## F. SOVULJ'S TESTIMONY: BOTH TASER DARTS MUST STRIKE TO CONVEY ELECTRICITY; TASER EMITS 19 PULSES OF ELECTRICITY PER SECOND.

As a 30(b)(6) witness called by plaintiff, Sovulj explained that a taser discharges two darts, which conduct electricity into the subject, incapacitating the subject due to involuntary muscle contractions:

> "[A] taser...conducts electrical pulses of electricity typically using probes. So when the trigger is pressed, then if there's a live cartridge loaded on the front of the weapon, then there's two probes which are basically darts that come out of the weapon, connected back to the device through wires that cycles electrical pulses from the Taser through the wires...causing incapacitation or control of the muscles....causing involuntary muscle contractions."[79]

Sovulj testified that each time a taser is discharged, it conveys 19 pulses of electricity per second, causing involuntary muscle contraction in the subject:

> "An actual discharge of Taser...there's 19 pulses of electricity per second when the device is running. So each pulse, if the probes are embedded

---

[79] A. 1539-1540.

-37-

in a subject effectively...will cause the contraction of the muscles basically 19 pulses per second."[80]

Sovulj testified that the standard taser electricity discharge "is a five-second cycle." A. 1469. Thus, the 7 discharges for Detective DiFrancesca's taser totaled 35 seconds, and the 6 discharges for Detective McNamara's taser totaled 30 seconds. A. 1570-1572. Accordingly, the combined 13 taser discharges were for 65 seconds. A. 1571.

However, for the taser to actually discharge electricity into a subject, both taser darts must strike the subject. "If you only strike with one probe, it's not going to be effective at all on the subject to achieve incapacitation."[81] "[W]ith only one probe in, there's no chance that the conducted energy weapon can incapacitate a subject." A. 1542.

## G. NYPD REPORTS BY DIFRANCESCA AND MCNAMARA: ALL FOUR TASER DARTS PENETRATED PAUL'S SKIN; ONLY 3 DARTS FOUND ON PAUL'S BODY.

Detectives DiFrancesca and McNamara each filed NYPD "Less Lethal/CED" reports. In their separate reports, DiFrancesca and McNamara provided answers showing: 1) their respective tasers fired 2 darts per taser (thus 4 darts total); and 2)

---

[80] A. 1546-1547.

[81] A. 1541.

each of the taser darts penetrated Paul's skin. A. 3556-3559 [Exhibits 15 and 16].

DiFrancesca and McNamara confirmed these report entries during their testimony. A. 1233-1240; 1246; 1368-1373.

Yet, as discussed in our Statement of the Case, the hospital chart and autopsy report note the presence of only 3 taser darts on Paul's body: right shoulder, right knee and left thigh.[82]

Further, despite firing their tasers for a total of 13 times at Paul, Detectives DiFrancesca and McNamara claimed they did not use excessive force against Paul. They blamed their conduct on purportedly ineffective tasers.[83] Although they pulled their tasers' triggers for a combined 13 times, DiFrancesca and McNamara testified the tasers seemingly had no effect on Paul as he was not incapacitated by the taser charges.[84]

### H.    READ-BACK OF DR. SMIDDY'S DEPOSITION TESTIMONY.

Pursuant to the District Court's ruling that Dr. Smiddy was unavailable to testify at trial, portions of her deposition testimony were read back to the jury.

Dr. Smiddy is a licensed medical doctor, board certified in pathology and is a

---

[82] A. 3564; 3582 [Exhibit 33; Exhibit BB].

[83] A. 1287, 1296, 1297; A. 1364.

[84] A. 1217-1219, 1222, 1275-1280; A. 1364-1365.

forensic pathologist.[85]  She performed the autopsy upon decedent Paul's body and authenticated her signature on the autopsy report.  A. 2933-2934.

While Dr. Smiddy observed and photographed taser prongs in decedent Paul's body, she did not possess or request taser records or reports from the NYPD.  A. 2943, 2951, 2975, 2976.

Therefore, in addition to her autopsy examination, the final diagnosis contained in Dr. Smiddy's autopsy report are based upon "The ambulance report, the emergency room report and police reports", as well as conversations with the Emergency Department physician at the hospital, Dr. Silverberg.[86]

The final diagnosis in the autopsy report reflect Dr. Smiddy's opinions to a reasonable degree of medical certainty as to the cause of Paul's death.[87] In the autopsy report, the first final diagnosis as a cause of death is "agitated delirium", which Dr. Smiddy explained,"It's a state where an individual becomes restless, agitated, they may be actively hallucinating, confused, combative, violent towards themselves or others."[88]

---

[85] A. 2794.

[86] A. 2939; 2981-2982.

[87] A. 2980.

[88] A. 2934.

-40-

Dr. Smiddy further testified that agitated delirium "causes a physiological response, an increase in heart rate, increase in blood pressure. It can cause changes in the brain. There may be increase in temperature, and if it's sustained, the heart stops beating." A. 2980-2981.

Dr. Smiddy could not rule out acidosis as a cause of Paul's death because a blood test cannot be performed postmortem since "the blood is clotted.[89] However, she did acknowledge that acidosis may be caused by extreme muscle use or exercise.[90]

Due to the Court's exclusion of the autopsy photographs (Path. 190 and 191), those photographs were not shown to the jury during the read-back of Dr. Smiddy's testimony concerning those very same photographs.

> Ms. Brown: Go to 367.
>
> Reading from page 367, starting line 3.
>
> Q:  This is a photograph of Mr. Paul where you cut open – his the skin on his neck, is that correct?
>
> A:  Yes.
>
> Q:  Can you show us, on this photograph, where the hemorrhage occurred from, the puncture wound that was on the right side of his neck; can you show us on that photograph?

---

[89] A. 2948.

[90] A. 2950.

-41-

The witness is indicating on the computer screen.

Q:     Okay. Pointing to the lower part of Mr. Paul's neck.

And you could tell that was where the hemorrhage occurred because there is blood there, correct?

A:     Yes.

Q:     That's a closer-up of that hemorrhaged puncture wound, correct?

A:     Yes.[91]

## SUMMARY OF LEGAL ARGUMENT

In our Points of Law, we argue the District Court abused its discretion in: 1) excluding the autopsy photographs; 2) ruling Dr. Smiddy as unavailable to testify at trial pursuant to Rule 804(a)(3); 3) denying plaintiff's trial motion for a mistrial; and 4) granting the Hospital Defendants' motion *in limine*.

In each instance, the District Court erred in making irrational rulings on the evidence and facts, and/or ruled contrary to applicable law, prejudicing plaintiff's ability to prove excessive force and medical malpractice.

---

[91] A. 2977-2978.

-42-

## POINTS OF LAW

### POINT I

**THE DISTRICT COURT'S RULINGS EXCLUDING THE AUTOPSY
PHOTOGRAPHS OF INTERNAL HEMORRHAGING IN DECEDENT
PAUL'S NECK AND DEEMING DR. SMIDDY UNAVAILABLE
TO TESTIFY AT TRIAL, ARE INEXTRICABLY LINKED
AND WERE IRRATIONAL AND MANIFESTLY ERRONEOUS.**

On the same day of trial — May 28, 2024 — but at different times, the District

Court: 1) deemed Dr. Smiddy unavailable to testify at trial[92]; and 2) then excluded

autopsy photographs showing internal hemorrhaging in decedent Paul's neck, because

Dr. Smiddy did not previously testify in her deposition as to "what these injuries

are...It's not married to her testimony."[93]

In excluding the autopsy photographs of the internal hemorrhaging in decedent

Paul's neck, the District Court held:

> "[W]ithout any testimony from Dr. Smiddy saying what these injuries
> are...It is not married to her testimony, at least that I've seen, and there
> appears to be ambiguity about exactly what she actually said about this
> in the first place. So in terms of 190 and 191 [marked as Exhibit 34], I
> find that under [Rule] 403 the probative value is insufficient to justify the
> prejudice that the jury would have from the photographs...[T]hat's
> Exhibit 34."[94]

---

[92] A. 2594-2601.

[93] A. 2779-2790.

[94] A. 2790.

The autopsy photographs of decedent Paul's neck showing internal hemorrhaging[95], may be consistent with and/or caused by a fourth taser dart — the missing taser dart needed for excessive force of two tasers, firing four darts together, for a combined 13 taser discharges. Thus, while the District Court deemed Dr. Smiddy unavailable to testify and then separately excluded her autopsy photographs, these two rulings are inextricably linked.

Indeed, by holding Dr. Smiddy unavailable to testify at trial and then excluding the autopsy photographs because they are not "married to her [prior deposition] testimony"[96], the District Court tied the plaintiff's hands prejudicing his ability to prove excessive force. Counsel for decedent Paul could not introduce into evidence the autopsy photographs, and no longer had the ability to question Dr. Smiddy at trial as to whether the internal hemorrhaging in the neck, shown in the photographs and documented by the autopsy report, was caused by and/or consistent with a fourth taser dart.

Accordingly, the District Court's linked rulings excluding the autopsy photographs and deeming Dr. Smiddy unavailable to testify at trial, were irrational and manifestly erroneous. This Court, therefore, should reverse the judgment upon the

---

[95] A. 3568-3569.

[96] *Id.*

-44-

District Court's abuse of discretion, and remand the matter for a new trial. *United States v. Won*, 2024 U.S. App Lexis 4628, *11 (2d Cir. 2024) (evidentiary rulings by the District Court reviewed "for abuse of discretion, reversing only if we find 'manifest error.'")*; Warr v. Liberatore*, 853 Fed. Appx. 694, *3 (2d Cir. 2021) ("We review the district court's evidentiary rulings for abuse of discretion and will reverse only if a ruling was arbitrary and irrational.").

### A.     INTERNAL HEMORRHAGING IN THE NECK: INJURY FROM THE FOURTH TASER PRONG OR IV LINE.

As previously discussed, one aspect of plaintiff's excessive force claim is that Detectives DiFrancesca and McNamara fired their tasers for a combined 13 taser discharges.  As Sovulj testified, each taser has two darts, and both darts must strike a subject to carry electricity and incapacitate a subject.  The NYPD reports by DiFrancesca and McNamara state that all four darts struck Paul.[97]  However, the fourth taser dart was missing from Paul's body.  The hospital record and autopsy report note only three taser darts in Paul's body. A. 3560, 3564; 3582 [Exhibits 33 and BB].

---

[97] A. 3556-3559 [Exhibits 15 and 16].

Thus, the two autopsy photographs of Path 190 and 191 within excluded Exhibit 34[98] are probative of whether internal hemorrhaging in Paul's neck was caused by and/or consistent with a fourth taser dart — the missing taser dart for excessive force.

In opposing admission of these photographs, defendants' attorneys cited Dr. Smiddy's autopsy report, which described the puncture wound in the neck as "a therapeutic intervention during the cardiac arrest", and thus not a taser wound. A. 2783. Dr. Smiddy, however, conceded that she did not observe an IV in decedent Paul's neck, despite categorizing the puncture site in the neck as from a therapeutic procedure.[99] Moreover, the hospital chart from North Central Bronx Hospital does not report any "therapeutic procedure" at or about Paul's neck, such as an IV line requiring a needle puncture. A. 3572-3619 [Exhibit BB]

During argument over admission of the autopsy photographs, counsel for decedent Paul emphasized that Dr. Smiddy did not possess the taser reports from Detectives DiFrancesca and McNamara, and therefore she did not know that four taser darts struck Paul:

---

[98] A. 3568-3569.

[99] A.2965, 2966 (read-back of Dr. Smiddy's prior deposition testimony as discussed infra).

-46-

"Dr. Smiddy wasn't given the Taser reports, so she didn't have the knowledge: Oh, maybe I need to be looking for another prong, since these officers said that there were four and that all four connected. So where is the other one?"[100]

Indeed, the read-back of Dr. Smiddy's deposition showed that while she observed and photographed taser prongs in decedent Paul's body, she did not possess or request taser records or reports from the NYPD. A. 2943, 2951, 2975, 2976.

Thus, the excluded autopsy photographs of Exhibit 34 are entirely probative of whether the puncture wound in the neck and its "associated" hemorrhaging[101] are consistent with a taser dart — the missing fourth dart which implicates excessive use of force by the Police Officer Defendants. As counsel for decedent Paul urged the District Court:

"[T]he evidence is there. I think it is for the jury to decide whether or not there was a therapeutic intervention or whether this was a Taser prong."[102]

\*\*\*

"[T]here is no evidence in the medical chart of medical intervention at that level [i.e. neck]. Then the officers' testimony about the Taser prongs connecting would leave a jury to decide whether or not that is or is not where the fourth taser prong went. Clearly the officers both testified and stood by their reports."[103]

---

[100]A. 2788.

[101] A. 3563 [Exhibit 33].

[102] A. 2785.

[103] *Id.*

-47-

Further, because the Court excluded the photographs — and deemed Dr. Smiddy unavailable to testify — the jury had no context for the read-back of Dr. Smiddy's deposition testimony concerning those very same photographs. A. 2977-2978.

On review of admissibility under Rule 403, "The appellate court 'must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983); *United States v. LaFlam*, 369 F.3d 153, 155-156 (2d Cir. 2004).   A    s autopsy photographs Path. 190 and 191 are probative of whether internal hemorrhaging in Paul's neck was caused by and/or consistent with a fourth taser dart, the District Court erred in:

A.     Excluding the autopsy photographs as lacking probative value in comparison to prejudice against the defendants; and

B.     Basing such exclusion upon no prior deposition testimony from Dr. Smiddy "saying what these injuries are"[104], while it separately ruled Dr. Smiddy unavailable to testify at trial.

Thus, the District Court prejudiced decedent Paul in his ability to prove excessive force against the Police Officer Defendants — a combined 13 taser

---

[104] A. 2790.

discharges from two tasers. Without these autopsy photographs, and lacking trial testimony from Dr. Smiddy, decedent Paul was unable to show that internal hemorrhaging in the neck, at the puncture site identified by Dr. Smiddy's autopsy report, was caused by or consistent with a fourth taser dart.

## B. THE DISTRICT COURT'S ERROR IN RULING DR. SMIDDY UNAVAILABLE TO TESTIFY AT TRIAL.

The District Court's error in excluding the autopsy photographs demonstrates the necessity for Dr. Smiddy to provide live-testimony at trial. The District Court, however, ruled Dr. Smiddy was unavailable to testify under Rule 804(a)(3) upon a bare Declaration. Under Rule 804(a)(3), "A declarant is considered to be unavailable as a witness", where such person "testifies to not remembering the subject matter."

After she was subpoenaed by plaintiff[105], the District Court issued an Order for Dr. Smiddy to submit "a sworn statement regarding the reasons why she believed she should not be required to testify", and answer certain specific questions contained in the Order. A. 1318-1319.

In deeming Dr. Smiddy unavailable under Rule 804(a)(3), the District Court accepted Dr. Smiddy's Declaration as proof she has "a general lack of memory with regard to her expertise as a medical examiner, and a specific lack with regard to the

---

[105] A. 442.

-49-

autopsy report she prepared in connection with Mr. Paul's death."  A. 2595, citing

para. 3-5 of Dr. Smiddy's Declaration.

Dr. Smiddy's Declaration did assert her "memory of this particular case,

including the autopsy report...is vague."[106]  However, the Declaration does not state

she lacks the ability to refresh her recollection by reviewing her autopsy report and

photos.

Further, contrary to the District Court, Dr. Smiddy did not claim "a general lack

of memory with regard to her expertise as a medical examiner...."[107]  Those are the

District Court's own words, not Dr. Smiddy's or even a paraphrase of her Declaration.

Dr. Smiddy's Declaration never asserts that she no longer possesses the knowledge

and/or skills of a medical examiner.  The District Court overreached.  Its decision

therefore was irrational and/or manifestly erroneous, constituting an abuse of

discretion. *Won*, 2024 U.S. App Lexis 4628, *11 (2d Cir. 2024) (evidentiary rulings

by the District Court reviewed "for abuse of discretion, reversing only if we find

'manifest error.'"); *Warr,* 853 Fed. Appx. 694, *3 (2d Cir. 2021) ("We review the

district court's evidentiary rulings for abuse of discretion and will reverse only if a

ruling was arbitrary and irrational.").

---

[106] A. 1634-1635.

[107] A. 2595.

We recognize Dr. Smiddy's Declaration does claim she has unspecified "problems related to cognitive impairment", and states her "memory is no longer sharp...I am having word-finding difficulty.  I have trouble with concentration."[108]  However, Dr. Smiddy readily discloses, "I have not received a medical diagnosis"[109], and no medical records, physician's letter or Declaration accompanied Dr. Smiddy's Declaration.

Dr. Smiddy performed the autopsy on decedent Paul, and therefore she is inextricably linked to the wrongly excluded autopsy photographs which may show hemorrhaging in the neck from a fourth taser dart.  Dr. Smiddy may still have the knowledge and/or ability to testify as to whether the wrongly excluded autopsy photographs are consistent with internal hemorrhaging in the neck from a fourth taser dart.

Evidence of a fourth taser dart in decedent Paul's body provides a direct link to the claim of excessive force: two tasers, firing four darts together, for a combined 13 taser discharges.  Thus, without in-person voir dire and/or testimony from Dr. Smiddy, it was entirely prejudicial to plaintiff for the District Court to deem her unavailable under Rule 804(a)(3).

---

[108] A. 1635.

[109] *Id.*

-51-

The District Court cited *United States v. Thomas,* 2000 U.S. App. Lexis 2224 (2d Cir. 2000), as authority for deeming Dr. Smiddy unavailable under Rule 804(a)(3), without requiring her to undergo voir dire in-person.[110] In *Thomas*, this Court held Rule 804(a)(3) "contains no requirement that the court order witnesses to testify before declaring them unavailable." *Id.*, at * 4 (2d. Cir. 2000).

*Thomas* is completely distinguishable from the instant matter. *Thomas* concerned a criminal trial where the witnesses "claimed sudden memory loss concerning their interactions with" the criminal defendant. *Id.* These witnesses conveniently lapsed into forgetfulness, likely to avoid harmful repercussions of testifying against the criminal defendant. As this Court has recognized, "[A]n 'unwilling witness often takes refuge in a failure to remember....'" *United States v. Insana*, 423 F.2d 1165, 1169 (2d Cir. 1970). Here, however, no harm comes to Dr. Smiddy from testifying in the instant matter.

The District Court prejudiced the plaintiff's case by deeming Dr. Smiddy unavailable under Rule 804(a)(3) without in-person voir dire and/or testimony from her demonstrating: 1) inability to remember her autopsy report and photographs, after refreshing recollection; and/or 2) "a general lack of memory with regard to her

---

[110] A. 2597.

-52-

expertise as a medical examiner"[111] as the District Court erroneously read into her Declaration.

The District Court then compounded its error by excluding the autopsy photographs because Dr. Smiddy was not asked in her deposition as to whether the internal hemorrhaging in Paul's neck was consistent with a fourth taser dart. A. 2790.

This Court should reverse the judgment upon the District Court's abuse of discretion in tying the plaintiff's hands prejudicing his ability to prove excessive force.[112] Counsel for decedent Paul could not introduce into evidence the autopsy photographs, and no longer had the ability to question Dr. Smiddy at trial as to whether the internal hemorrhaging in the neck, shown in the photographs and documented by the autopsy report, was consistent with a fourth taser dart.

---

[111] A. 2595.

[112] *Won*, 2024 U.S. App Lexis 4628, *11 (2d Cir. 2024); *Warr,* 853 Fed. Appx. 694, *3 (2d Cir. 2021).

-53-

## POINT II

**THE DISTRICT COURT COMMITTED MANIFEST ERROR IN DENYING PLAINTIFF'S MOTION FOR A MISTRIAL; DR. KROLL SUBSTITUTED A 2024 STANDARD FOR TASER USE IN PLACE OF THE 2015 STANDARD IN EFFECT AT THE TIME OF INCIDENT, AND PROFFERED UNRELIABLE TESTIMONY CONCERNING A PURPORTED SCIENTIFIC STUDY.**

The District Court committed reversible error when it denied plaintiff's motion for an immediate mistrial, made during Dr. Kroll's expert testimony on behalf of the Police Officer Defendants. A. 2856-2863. The District Court utterly failed in its role as gatekeeper of expert testimony, when it permitted Dr. Kroll, the defense taser expert, to:

A.    Improperly testify to a 2024 standard for discharging a taser on an individual, instead of New York City Police Department standard in effect in July 2015, when the Paul incident occurred[113];

B.    Implicitly communicate to the jury, a legal standard as to excessive force in discharging a taser upon an individual; and

---

[113]A. 2856-2857.

-54-

C. Provide unreliable, ipse dixit testimony concerning a purported military study at Pennsylvania State University as to the use of tasers upon "anesthetized swines" for "30 minutes of exposure."[114]

The District Court's admission of Dr. Kroll's impermissible expert testimony, and its denial of plaintiff's motion for an immediate mistrial, was manifest error and thus an abuse of discretion. *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002) (abuse of discretion where admission or exclusion of expert testimony is "manifestly erroneous."). Plaintiff therefore requests this Court reverse the judgment and remand the matter for a new trial.

## A. DR. KROLL'S IMPROPER SUBSTITUTION OF 2024 STANDARDS FOR THE 2015 NYPD STANDARD IN EFFECT AT THE TIME OF INCIDENT.

The touchstone for admission of expert testimony is relevancy and reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Pursuant to Rule 702 of the Federal Rules of Evidence, "the District Court acts as a gatekeeper and 'is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"*Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (emphasis in original).

---

[114] A. 2865.

Here, the District Court committed manifest error in permitting Dr. Kroll to testify to an entirely irrelevant standard for taser use — a 2024 standard contemporaneous with the trial, instead of the 2015 NYPD standard in effect at the time of the Paul incident.

The NYPD Patrol Guide for taser use, in effect for July 2015, was introduced into evidence at trial as Exhibit 6. It explicitly stated: "In no situation will more than three standard discharge cycles be used against any subject."[115]

As a 30(b)(6) witness on taser use by the NYPD, Officer Sovulj testified that the standard taser electricity discharge "is a five-second cycle." A. 1469. He further testified that under the NYPD Patrol Guide in effect in 2015, three taser discharges at five seconds apiece was the maximum number of taser discharge cycles that should be used against a person. A. 1570.

Dr. Kroll, however, disregarded Sovulj and the NYPD Patrol Guide in effect in 2015 when the Paul incident occurred. Dr. Kroll opined at trial in May 2024 that such 2015 standards were "obsolete", and therefore "meaningless." A. 2856-2857. Dr. Kroll testified as follows:

> Q:    I want you to assume that the jury has heard that NYPD guidelines in 2015 instructed officers not to use more than

---

[115] A. 3552 [Exhibit 6].

**three standard discharge cycles against any subject.  Are you familiar with that type of guidance in the context of taser use?**

Mr. Sells [plaintiff's counsel]: Objection, your Honor.

The Court: I will allow it.  Overruled.

**A:     The baseball rule was popular 10, 15 years ago.  It's obsolete.**

Mr. Sells: Objection, your Honor.

The Court: Sustained.

**Q:     Doctor you referred to the baseball rule.  Is there a scientific rationale behind that type of guidance with regard to tasers?**

Mr Sells: Objection, your Honor.

The Court:   I'll allow it.  Go ahead.

**A:     No.  Because it implies that 15 seconds of electronic muscle control is safe and 16 seconds could be dangerous, which is, frankly, silly when we have the FDA approving stronger muscle stimulators up to 40 minutes.  So it really should be minutes, not seconds.[116]**

In addition to objecting to Dr. Kroll's testimony, plaintiff's counsel moved for an immediate mistrial because Dr. Kroll substituted a 2024 standard for taser use in place of the 2015 standard set by the NYPD Guide and confirmed by Sovulj.  A. 2857-2863.  As plaintiff's counsel argued, Dr. Kroll testified "what the standards are

---

[116] A. 2856-2857.

-57-

today"[117], and Dr. Kroll opined the 2015 standard in effect at the time of the Paul incident is "basically meaningless given today's science. Because he is using not from the science in 2015 when this case happened, he is talking about now." A. 2858, 2861.

Plaintiff's counsel further argued that Dr. Kroll's use of an irrelevant 2024 standard for a 2015 incident is "so prejudicial, it goes directly to whether or not there was excessive force used." A. 2858. Indeed, instead of the NYPD's standard in effect in 2015 at the time of the Paul incident, Dr. Kroll testified that in 2024 "[W]e have the FDA approving stronger muscle stimulators and up to 40 minutes. So it really should be minutes, not seconds." A. 2856-2857.

The District Court denied plaintiff's motion for a mistrial[118], prejudicing plaintiff's excessive force case, which concerned: 1) a 2015 incident; 2) involving 13 combined taser discharges; and 3) for a period of 65 seconds.[119]

The District Court committed manifest error precisely because the Paul incident occurred in 2015, not 2024. As a matter of law, the relevant standard was the one in effect in 2015 — not 2024 at the time of trial. *Cuellar v. Love,* 2014 U.S. Dist. Lexis

---

[117] A. 2858.

[118] A. 2859.

[119] A. 1461, 1463, 1470-1484, 1489-1494, 1570-1571.

96988, *9 (S.D.N.Y. 2014) ("It is reasonable that a trier of fact could consider Defendants' actions in light of the training they received through June 26, 2010 the date of the incident, as part of the totality of the circumstances."); *Seridge v. Bay Street, LLC*, 2012 U.S. Dist. Lexis 4038,*4 (E.D.N.Y. 2012) (expert testimony concerning an ASTM standard, "must cite the version that was in effect at the time of the incident."); *Kumho Tire Co.*, 526 U.S. 137, 150 (1999) ("*Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'").

Further, in substituting a 2024 standard for the one in effect in 2015, Dr. Kroll implicitly communicated to the jury a legal standard as to excessive force in discharging taser darts upon an individual. Dr. Kroll testified that instead of "15 seconds of electronic muscle control is safe and 16 seconds could be dangerous...it really should be minutes, not seconds." A. 2856-2857. Pursuant to Rule 702, an expert cannot usurp the role of judge and/or jury "by communicating a legal standard — explicit or implicit — to the jury." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

The harm by Dr. Kroll's improper expert testimony, and the District Court's failure as evidentiary gatekeeper, could not be undone. The District Court committed manifest error in denying plaintiff's motion for a mistrial where it permitted Dr. Kroll to testify to an irrelevant standard, prejudicing plaintiff's excessive force case.

### B.   DR. KROLL'S UNRELIABLE, IPSE DIXIT TESTIMONY: PURPORTED MILITARY STUDY OF TASER USE.

As this Court held in *Nimely v. City of New York*, 414 F.3d 328, 396 (2d Cir. 2005), "*Daubert* explained, Rule 702 governs the district court's responsibility to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"

Here, even where counsel for the Police Officer Defendants asked Dr. Kroll specifically about the 2015 standard for taser use, Dr. Kroll provided unreliable, ipse dixit testimony concerning a purported military study at Pennsylvania State University as to the use of tasers upon "anesthetized swines" for "30 minutes of exposure."[120]

The testimony in this regard is the following:

> **Q:   As you understood taser technology back in 2015, was there a scientific rationale behind that guidance [of no more than 3 cycles]?**
>
> Mr. Sells: Objection, your Honor.
>
> The Court: Overruled.  You can answer.
>
> A:   No, there was no scientific rationale behind it.
>
> Q:   Can you explain why you hold that opinion?
>
> Mr. Sells: Objection, your Honor.

---

[120] A. 2865.

The Court: Overruled.

A:     **There was simply no data from animal to human studies that suggested an increase risk going from, say, 15 seconds to 16. In fact, the military did a study —**

Mr. Sells: Objection, your Honor.

The Court: I will allow it.  Overruled.

A:     **---- at Penn State where they subjected anesthetized swines to 30 minutes of exposure.  And none of them were killed by the weapon.**[121]

Dr. Kroll never provided any details or supporting evidence for his testimony as to this purported military study of the effects of taser use for 30 minutes upon anesthetized swine.  Moreover, Dr. Kroll did not testify whether this purported study occurred prior to 2015, in 2015 or thereafter.  Therefore, there is absolutely no reliability and/or relevancy for Dr. Kroll's testimony.

"'Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Nimely,* 414 F.3d at 396 (2d Cir. 2005).  "The 'gatekeeping' function under *Daubert* is fundamentally about 'ensur[ing] the reliability and relevancy of expert testimony,' and district courts may not stray from those goals."

---

[121] A. 2865.

*Showers v. Pfizer, Inc. (In re Pfizer Inc. Sec. Litig.)*, 819 F.3d 642, 658 (2d Cir. 2016).

Thus, the District Court committed manifest error in permitting Dr. Kroll's unreliable testimony of the purported military study, which exists only upon his ipse dixit assertion, and without reference to the study's details and/or when the study occurred.

## POINT III

**THE DISTRICT COURT COMMITTED MANIFEST ERROR IN GRANTING THE HOSPITAL DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THEIR ROOT CAUSE REPORT; CHRONOLOGY AND FACTUAL STATEMENTS IN THE ROOT CAUSE REPORT WERE ADMISSIBLE AS AN OPPOSING PARTY STATEMENT, AND WERE NOT PRIVILEGED.**

The District Court's exclusion of the Root Cause Report *in toto* was an abuse of discretion as it was manifestly wrong on the law. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 439 (2d Cir. 2006) ("[A] district Court necessarily abuses its discretion when its decision rests on an error of law...."); *Shaeed v. Kroski*, 2020 U.S. App. Lexis 35023, fn 4 (2d Cir. 2020) (a District Court's decision on a motion *in limine* is reviewed "for abuse of discretion.").

The District Court failed to appreciate that a portion of the Root Cause Report was admissible as a matter of law: the notation that Paul arrived in the Emergency Department at 12:45 a.m., and was assessed by hospital personnel at such time. A.

-62-

385. These factual statements were admissible as opposing party statements under Rule 801(d)(2), and were not privileged.

### A. THE HOSPITAL DEFENDANTS' ROOT CAUSE REPORT SUPPORTS PAUL'S ARRIVAL AT 12:46 A.M., AND NO TREATMENT UNTIL CARDIAC ARREST AT 1:20 A.M.

Due to the discrepancy between the FDNY Ambulance Call Report and the EMS Call Report, an issue at trial arose as to:

> A. Whether Paul arrived in the Emergency Department at or about 12:46 a.m., and was not seen by the triage nurse until 14 minutes later at 1:00 a.m.; or

> B. Whether he arrived in the Emergency Department at or about 12:58 a.m., and seen by the triage nurse only two minutes later at 1:00 a.m.

This discrepancy is directly related to Dr. Cohen's opinion that based upon the FDNY Ambulance Call Report stating Paul's arrival at 12:46 a.m., the Hospital Defendants departed from the standard of care in failing to triage and treat Paul in a timely manner. A. 2432-2433, 2437-2438.

The Root Cause Report, redacted by plaintiff's counsel, states as follows:

"0045: The patient arrived in the Adult Emergency department on a stretcher accompanied by EMS and 4 NYPD officers...The triage nurse and Attending physician went to assess the patient immediately upon arrival."

***

"The ED Attending and nursing staff assessed the patient immediately upon arrival and never left his bedside."[122]

As explained herein, these factual statements in the Root Cause Report support: 1) Paul's arrival in the Emergency Department at 12:46 a.m. per the FDNY Ambulance Call Report; and/or 2) no medical treatment was rendered to Paul after triage assessment until cardiac arrest.

## B. THE ROOT CAUSE REPORT AS THE HOSPITAL DEFENDANTS' STATEMENT; COUNSEL'S BINDING ADMISSION.

It is undisputed that the Hospital Defendants wrote the Root Cause Report. In their motion *in limine,* counsel for the Hospital Defendants stated, "Mr. Paul's death was investigated by the hospital's Quality Assurance Committee, leading to the report that is the subject of this motion." A. 302.

During discovery proceedings, in a letter to Magistrate Judge Netburn, counsel for the Hospital Defendants explicitly conceded the Root Cause Report was **"generated by the hospital** with regard to the care rendered to the decedent Anthony Paul, on July 2, 2015."[123] In requiring its disclosure, Magistrate Netburn recognized,

---

[122] A. 385.

[123] ECF Doc. 204, letter dated 10-4-18.

**"The Root Cause Analysis Report is a document created by the Hospital Defendants...."**[124]

Counsel's explicit representation to the Court that the Root Cause Report was **"generated by the hospital"** is a binding admission that the Hospital Defendants — and their employees — wrote the Root Cause Report, and therefore it is their party statement. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92 (1990) ("Under our system of representative litigation,' each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"); *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) ("Facts admitted by a party 'are judicial admissions that bind th[at] [party] throughout th[e] litigation.'").

### C. DISTRICT COURT'S MANIFEST ERROR: EXCLUSION OF THE REDACTED ROOT CAUSE REPORT BECAUSE PLAINTIFF DID NOT PROVE IT WAS A PARTY STATEMENT UNDER RULE 801(d)(2).

In its Order excluding the Root Cause Report, the District Court acknowledges the Hospital Defendants "concede that this document was prepared by the Quality

---

[124] ECF Doc. 209, Order entered 10-16-18.

Assurance Department at North Bronx Central Hospital, which is part of the hospital."[125]

However, the District Court held that did not sufficiently prove the Root Cause Report was a party statement under Rule 801(d)(2). The District Court faulted plaintiff as it "did not take any steps to obtain the necessary foundational evidence in discovery" to qualify the Root Cause Report as an opposing party statement under Rule 801(d)(2).[126] The District Court recounted plaintiff's contention that "we had the admission, and I didn't feel that we needed to do anything more."[127] However, the District Court rejected plaintiff's argument, holding: "I disagree that the statement in the document itself constitutes an admission."[128]

The District Court was wrong as a matter of law in excluding the redacted Root Cause Report. Its Order contained an overly-complicated analysis of requirements under Rule 801(d)(2)[129], when the matter was plain and simple. The Hospital Defendants conceded the Root Cause Report was their document. Thus, contrary to

---

[125] A. 445.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.*

the District Court, no additional "foundational evidence"[130] was necessary. Indeed, not only did counsel for the Hospital Defendants explicitly concede the Root Cause Report was "generated by the hospital"[131], but it carries the heading:

> "New York City Health & Hospitals Corporation
> Report to the Quality Assurance Committee of the Board
> of Directors (GB) Acute Care Facility."[132]

The Root Cause Report was admissible no matter the specific subsection under Rule 801(d)(2). The Hospital Defendants, obviously through their duly authorized employees and/or agents, drafted the Root Cause Report. Thus, it is admissible as an opposing party statement under Rule 801(d)(2), subsections (a), ( c) or (d). Once the Hospital Defendants conceded they wrote the Root Cause Report, plaintiff is not required to obtain discovery of which employees drafted and/or generated the document to render it admissible as an opposing party statement. Indeed, in *S. Leo Harmony, Inc. v. Binks Mfg. Co.*[133], the defendants admitted that its "personnel prepared bar charts" at issue, and therefore the District Court held "these bar charts are admissible in evidence as admissions by a party, Fed. R. Evid. 801(d)(2)...."

---

[130] *Id.*

[131] ECF Doc. 204, letter dated 10-4-18.

[132] A. 385.

[133] 597 F.Supp. 1014, 1022 (S.D.N.Y. 1984), aff'd 762 F.2d 990 (2d Cir. 1985).

As a matter of law, therefore, the factual notations that Paul arrived in the Emergency Department at 12:45 a.m., and was assessed by hospital personnel at such time, are facts admissible as opposing party statements under Rule 801(d)(2) — whether under subsections (a), ( c) or (d). Plaintiff voluntarily redacted the Root Cause Report, seeking only to admit these facts as opposing party statements.[134]

Because of the discrepancy between the ambulance reports as to when Paul arrived at the Emergency Department — 12:46 a.m. or 12:58 a.m. — the District Court's manifest error in excluding the factual statements in the Root Cause Report prejudiced plaintiff's ability to: 1) counter the discrepant EMS Report; and 2) thereby prove the Hospital Defendants' medical malpractice in failing to timely triage and treat Paul.

The Root Cause Report's factual statement that Paul arrived in the Emergency Department at 12:45 a.m. is a party admission that supports the arrival time of 12:46 a.m. listed in the FDNY Ambulance Report[135], and thus plaintiff's allegations of medical malpractice in failing to timely triage and treat Paul.

Indeed, the FDNY Ambulance Report and the Root Cause Report show that Paul arrived in the Emergency Department at 12:45/12:46 a.m. The Root Cause

---

[134] A. 376, 385-392.

[135] A. 3578.

-68-

Report further states that hospital personnel "went to assess the patient" at such time.[136] Yet, Nurse Matira was emphatic that she triaged Paul only at 1:00 a.m.[137], her triage note is timed at 1:00 a.m., and no treatment notes exist thereafter until 1:20 a.m. when Paul suffers cardiac arrest.[138]

So pursuant to the Root Cause Report, what were hospital personnel doing at 12:45 a.m.? The answer from the hospital chart and Nurse Matira is that they did nothing — until 1:00 a.m. Thus, to the plaintiff's point at trial, if Paul arrived in the Emergency Department at 12:45/12:46 a.m. — per the FDNY Ambulance Report and the Root Cause Report — and there is no record of triage until 1:00 a.m., there was a failure to timely triage and treat Paul.

The Root Cause Report, as well as the FDNY Ambulance Report, counter the discrepant EMS Report stating arrival "At Destination" at 12:58 a.m.[139], with triage at 1:00 a.m. per the hospital record. The Root Cause Report is the Hospital Defendant's *admission* that Paul arrived in the Emergency Department at 12:45 a.m., as opposed to 12:58 a.m. as stated in EMS Report.

---

[136] A. 385.

[137] A. 2361.

[138] A. 3580-3586.

[139] A. 3597.

-69-

Thus, in excluding the Root Cause Report with the time notation of 12:45 a.m., the District Court prejudiced plaintiff's ability to counter the discrepant EMS Report and prove medical malpractice for failure to timely triage and treat Paul. This Court is "especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance." *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000).

Accordingly, this Court should reverse the District Court, remand the matter for a new trial with admission into evidence of Root Cause Report's factual statement that Paul arrived in the Emergency Department at 12:45 a.m. and was assessed by hospital personnel at such time.

### D. THE FACTUAL STATEMENTS IN THE ROOT CAUSE REPORT ARE NOT PRIVILEGED; THE DISTRICT COURT DID NOT ADDRESS PRIVILEGE.

The Hospital Defendants' motion *in limine* did not deny the Root Cause Report was a party statement, but sought exclusion on the basis of the quality assurance privilege in medical malpractice actions under New York State law. In excluding the Root Cause Report for failing to satisfy Rule 801(d)(2), the District Court did not address the matter of privilege.

Nonetheless, the New York State privilege statutes cited by the Hospital Defendants do not apply in the instant action. "'[C]ourts consistently have held that

the asserted privileges are governed by the principles of federal law' where the action is in federal court, and the evidence sought is relevant to both federal and state law claims." *Morshed v. St. Barnabas Hosp*., 2017 U.S. Dist. Lexis 19610, *3-4 (S.D.N.Y. 2017).

Here, the factual statements in the Root Cause Report are "relevant to both federal and state law claims." *Id.* In Section 1983 actions, "The type and amount of such damages 'is ordinarily determined according to principles derived from the common law of torts." *Jaquez v. Flores*, 2016 U.S. LEXIS 34517, *15 (S.D.N.Y. 2016). Thus, under common law, the Police Officer Defendants as the initial tortfeasors "may well be liable to the plaintiff for the entire damage proximately resulting from [their] own wrongful acts, including aggravation of injuries by a successive tortfeasor" — the Hospital Defendants. *Ravo v. Rogatnick,* 70 N.Y.2d 305, 309 (1987).

Further, under federal law the factual statements in the redacted Root Cause Report are not privileged. The federal Patient Safety and Quality Improvement Act (PSQIA) protects as privileged *only* "analysis of, and subsequent corrective actions related to [an] adverse event or medical errors[.]"*Francis v. United States*, 2011 U.S. Dist. LEXIS 59762, *23 (S.D.N.Y. 2011). However, "chronologies, which contain no similar analysis, cannot, by definition, be subject to the self-critical analysis

-71-

privilege." *Id.* Similarly, "Congress did not create a privilege for medical peer review" reports through the Health Care Quality Improvement Act (HCQUIA).[140]

Accordingly, the redacted Root Cause Report is not privileged under federal law, as it provides: 1) the chronology of 12:45 a.m. as Paul's arrival in the Emergency Department; and 2) the purely factual notation of hospital personnel interaction with Paul at such time. Thus, the redacted Root Cause Report is admissible under Rule 801(d)(2) as previously discussed.

## CONCLUSION

Plaintiff-Appellant Paul respectfully requests this Court reverse the District Court's Judgment in all respects, grant a new trial, and reverse the District Court's Order entered May 6, 2024, which granted the Hospital Defendants' motion *in limine*.

Respectfully submitted,

THE COCHRAN FIRM

By:____/s/_ Derek S. Sells_____
        Derek S. Sells, Esq. Attorneys
        for Plaintiff
        55 Broadway, 23rd Floor
        New York, NY 10006
        212-553-9215
Dated: December 3, 2024        dsells@cochranfirmny.com

---

[140] *Morshed,* 2017 U.S. Dist. Lexis 19610, *7 (S.D.N.Y. 2017).

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 13,991 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

__/s/__ Derek S. Sells
_____
Derek S. Sells, Esq.

Dated: December 3, 2024

# SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

Judgment, dated July 22, 2024, Appealed From........ SPA-1

SPA-1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

ANTHONY ANDRE PAUL, et al.,

                        Plaintiffs,

               -against-

NORTH CENTRAL BRONX HOSPITAL, et al.,

                        Defendants.

--------------------------------------------------------------X

16 **CIVIL** 1952 (VSB)

**JUDGMENT**

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That after a Jury Trial before the Honorable Vernon S. Broderick, United States District Judge, the jury having returned a verdict in favor of the Defendants. The complaint is dismissed against Detective Anthony DiFrancesca, Deputy Chief Vincent Giordano, Detective Richard Hefner, Police Officer Aramis Ramos, Detective Darren McNamara, Captain Eugene McCarthy, Sergeant O'Doherty, Lt. Michael Licitra, North Central Bronx Hospital and New York City Health and Hospitals Corporation.

**DATED:** New York, New York
           July 22, 2024

                                DANIEL ORTIZ
                             _____
So Ordered:                        Acting Clerk of Court

                             BY:

_____         _____
         U.S.D.J.                            Deputy Clerk